JOHN MASLIN, ANN MASLIN, AND OTHERS, LESSEE, *vs.* JOHN H. THOMAS.—*June Term*, 1849.

Where an estate tail is docked by a deed of bargain and sale, under the act of 1782, ch. 23, an outstanding, unsatisfied judgment against the tenant in tail, will not be let in as a lien or incumbrance on the estate thereby created or enlarged, as would have been the case, had the estate tail been barred by a common recovery.

It was an incident to a common recovery suffered by a tenant in tail, to let in all preceding incumbrances, but there is no such incident to the deed of bargain and sale.  Nor is it incident to an estate tail that every mode of defeating it shall have such effect.

The act of 1782, ch. 23, abolished the ancient mode of docking estates tail by common recovery.

A party who takes a deed from a tenant in tail, which he is authorised, by the act of 1782, to take, is not thereby estopped, as the recoveror in a common recovery would be, from averring that the tenant in tail had only an estate tail.

The concluding words of this act, that all persons shall be debarred who might or could be debarred "by any mode of common recovery," cannot have the effect to introduce a new or more convenient *common recovery*, with all the incidents to the ancient mode, but were used *ex abundanti cautela*, as without them, it might have been contended, that a deed of bargain and sale, or other conveyance of an estate tail, would only perform the office of a fine, or a common recovery with a single voucher.

Where testimony is offered, which has no tendency to prove the issue in the case, it is error to permit it to go to the jury.

The declarations of a tenant in tail, that he "got the land in controversy by

intailment," are admissible for the purpose of proving pedigree, *but not to prove his title to the land as tenant in tail.*

Estates tail are created by deed or will, which must be produced, or a proper foundation must be laid for presuming that they existed. Their existence is not to be proved by oral testimony of this description.

Appeal from *Queen Anne's* county court.

This was an action of ejectment instituted by the lessors of the plaintiff (the appellants,) against the appellee, in *Queen Anne's* county court, at November term, 1847, for the recovery of a tract of land situated in said county, called "*Boothby's Fortune,*" containing about 500 acres, more or less. The defendant took defence on warrant.

1st EXCEPTION. At the trial, the plaintiffs offered in evidence a patent dated 1st of February, 1695, granting the land in question to one *Thomas Jackson*, and then offered the will of *Samuel Wallis*, executed the 19th of September, 1717, which contains, among others, the following clause: "*Item.*— I give and bequeath unto my son, *William Wallis*, five hundred acres of land, lying in *Queen Anne's* county, called "*Boothby's Fortune,*" and also seventy acres of land lying in *Kent* county, being part of "*Partnership,*" that runs down to *Chester* river; and it is my will, that if either of my sons, *Samuel* and *Hugh*, should die without issue, that his part go to my son, *William Wallis;* and if my son *William* should die without issue, that then the survivors of my said sons to have the aforesaid land equally divided between them." They then proved by oral testimony, that another *William Wallis*, the great-grandson of the above named devisee, and his only male descendant, was in possession of said land as tenant in tail, until he sold the same to one *Lewis Blackiston.* Much other proof was also offered in relation to the pedigree of the *Wallis* family, which the opinion of this court renders it unnecessary to state. The plaintiffs then offered in evidence a deed of bargain and sale from *William Wallis* to *Lewis Blackiston*, dated the 27th of May 1819, conveying the land in question to the latter, in fee simple. This deed also contains a general warranty of title, and a covenant for further assurances. It was

then admitted that said *Lewis Blackiston* left an only child, *Hannah Susannah,* who intermarried with *William Thomas,* by whom she had a son, *William B. Thomas,* her only child and heir at law; that *Lewis Blackiston* died in the year 1821, leaving a last will and testament, which was offered in evidence, and which contains the following clause: "*Item.*—I give and bequeath unto my daughter, *Hannah Susannah Thomas,* my plantation whereon I now dwell, and purchased of *William Wallis, Esq.,* known by the name of "*Boothby's Fortune,*" or by any other name whatsoever it may be called, containing five hundred acres, more or less, to her the said *Honnah Susannah Thomas,* for and during her natural life, and at her death to her heirs, to them and their heirs and assigns forever." It was further admitted, that said *Hannah S. Thomas* died in March 1823, and her son, *William B. Thomas,* in the summer of 1832, and his father, the said *William Thomas,* in the fall following; and that the lessors of the plaintiff are the heirs at law of the said *Lewis Blackiston,* and of the said *William B. Thomas.* The *defendant* then offered in evidence a judgment obtained by confession in *Queen Anne's* county court, on the 25th of October, 1818, by *Cornelius Comeggs,* surviving obligee of *Peregrine Falconer,* who were surviving executors of *Benjamin Comeggs,* against *William Wallis,* for $2,275, with interest thereon from the 27th of January, 1807, until paid, and costs. The defendant then offered a writ of *sci. fa.,* sued out at May term, 1823, on the above judgment against *William Thomas,* the terre-tenant of *William Wallis.* This *sci. fa.* was renewed on the 15th of December, 1824, on the 20th of June, 1826, and a *fiat* was entered at October term, 1826, upon which a *fi. fa.* was issued on the 17th of January, 1827, and levied on the lands in controversy. At the May term 1831, a writ of *venditioni exponas* was issued, by virtue of which, said land was sold by the sheriff, who executed a deed to the purchaser therefor, dated the 27th of March, 1832. Under this deed the defendant holds the lands mentioned in the proceedings. To this evidence offered by the defendant, the plaintiff objected, but the court (ECCLESTON, A. J.,) overruled the ob-

jection, and suffered the evidence to go to the jury. To this decision the plaintiff excepted.

2ND EXCEPTION. In addition to the matters in this first bill of exceptions, the plaintiff produced *John V. Woodall*, a competent witness, by whom he offered to prove, that after said *William Wallis* arrived at age, and while in possession of said land, and long before he sold the same to said *Blackiston*. Witness had several conversations with said *Wallis*, in which he claimed said lands *by intailment*, and because his sister, *Elizabeth*, had received no part of said lands, he had given her, as a present, his note or bond for a sum of money, the amount of which witness does not recollect. He also offered to prove, by said witness, that before said *Wallis* arrived at age, witness heard him say, that he had got said land by intailment. The defendant then prayed the court to instruct the jury, that said evidence was admissible for the purpose of proving pedigree, but was inadmissible for the purpose of proving that *William Wallis* had title to the land as tenant in tail, which instruction the court gave, and to the granting of which, the plaintiff excepted.

3RD EXCEPTION. The plaintiff, in addition to the proof in his 1st and 2nd bills of exceptions, offered in evidence extracts from the entries in the debit books for *Queen Anne's* county, for the years 1747, 1754, and 1756, in each of which years is the following entry:

| " *William Wallis, Dr.* | *Amo't of Rent.* |
| --- | --- |
| | £. s. d. |
| *Boothby's Fortune*, 500 *acres*, - - - | 1 0 0." |

In the year 1757, the same land and rent are charged to "*William Wallis'* widow," and in 1758, to "*William Wallis'* heirs." He also offered evidence to prove that *William Wallis*, the devisee of *Samuel Wallis*, died in said county in the year 1757, and that no land records, or records of deeds, can be found in the office of the clerk of said county, prior to the year 1707. The plaintiff then asked the court to instruct the jury, that if they shall believe, from the evidence in the case, that *William Wallis* held *Boothby's Fortune* in tail at the time of

the recovery of the judgment of *Comeggs vs. Willis,* that said judgment bound no other than his interest in said land at the date of the judgment, and that the proceedings under said judgment conveyed no greater interest in said lands than the interest of said *Wallis* at the rendition of said judgment, which instruction the court refused to give, and to this refusal the plaintiff excepted, and the verdict and judgment being against him, he appealed to this court.

The cause was argued before DORSEY, C. J., SPENCE, MAGRUDER, MARTIN and FRICK, J.

GEORGE VICKERS, R. B. CARMICHAEL and M. BROWN, for the appellants, contended:

1st. That the deed in fee from *William Wallis* to *Lewis Blackiston,* of the estate tail of said *Wallis,* did not operate to let in as a lien and incumbrance against said land the judgment against said *Wallis,* for a longer period than the life of said *Wallis.*

2nd. That the evidence of the judgment against *Wallis,* the *sci. fas.* against *Thomas,* the terre-tenant, the *fi. fa.* and *vendi. exponas,* the sale by the sheriff, and his return and deed to the purchaser, were not admissible to prove that the title in fee to said land was sold and conveyed to such purchaser.

3rd. That the levy, sale and conveyance by the sheriff, transferred to the purchaser only the life estate of *Thomas,* the terre-tenant.

4th. That there was error in refusing to admit the testimony of *Woodall,* in reference to the declarations of *Wallis,* as to the quality of the estate held by him in said land.

RICAUD, PRICE and SPENCER, for the appellees, contended:

1st. That the court were right in allowing the evidence in the first bill of exceptions to go to the jury, because it was legal and competent testimony under the issue, as it tended to prove the defendant's title to the land.

2nd. That the testimony in the second bill of exceptions, to

prove the character of the estate held by *Wallis*, in said land, was properly rejected, because the same was only hearsay.

3rd. The court were right in refusing the prayer of the plaintiffs, contained in their third bill of exceptions, because the deed for said land from *Wallis* to *Blackiston*, in fee, subsequent to the rendition of the said judgment, rendered the said land, in the hands of the purchaser, subject to all the prior incumbrances of the tenant in tail, and, therefore, subject to said judgment.

MAGRUDER, J., delivered the opinion of this court.

It appears from the record now before us, that the plaintiffs instituted, in *Queen Anne's* county court, an action of ejectment to recover a tract of land called *"Boothby's Fortune,"* granted in fee on the 1st day of February, 1695, to one *Thomas Jackson*. A trial was had, and the defendant obtained a verdict. In the course of the trial, three exceptions were taken by the plaintiffs; and wherein (if at all,) the court below erred, according to these exceptions, it is for this court now to decide.

Of the land in controversy, granted as aforesaid, one *Samuel Wallis* is supposed to have died seized in fee, and his will, dated the 19th September, 1717, is to be found in the first bill of exceptions. By this will, the testator devises to his son, *William Wallis*, the tract of land, aforesaid, called *"Boothby's Fortune;"* and in a subsequent clause he declares it to be his will, that "if his son *William* should die without issue, then the survivors of his sons (previously mentioned,) shall have the aforesaid land, equally to be divided between them." Much oral testimony is introduced into the bill of exceptions, but of this we shall take no notice, as the questions of law which we are to decide, do not at all depend upon it. Next is produced, by the plaintiff, a deed executed on the 25th May, 1819, by another *William Wallis*, (the then tenant in tail of the land in controversy, it is supposed,) conveying this land *in fee* to *Lewis Blackiston*.

Thus far, there can be no disagreement between the parties before us about the title to this land now, whatever may be the

case in any other trial.   Both must assume that the bargainor in that deed was, at the time of its execution, the tenant in tail, and thereby destroying the estate tail, as the plaintiffs undertake to derive their title from the bargainee in that deed, and the defendant claims the land simply because of the execution of that deed.   The ground taken by the latter is, that at the time of this conveyance, there was an unsatisfied judgment against the then tenant in tail, (the bargainor in the deed,) and that the deed destroying the entail, and creating an estate in fee, that judgment was a lien upon the estate thus created or enlarged.   He then shows a sale of this land in satisfaction of that judgment, and would thus prove himself the owner of the land.

The first question, then, to be decided is, whether, if there be a judgment against a tenant in tail, and without satisfying that judgment, he enlarges his estate tail into a fee simple, by a deed of bargain and sale to another, that land upon which, while it was an estate tail, the judgment was no lien at all, can be sold (the fee simple,) for the payment of such judgment? The defendant maintains the affirmative of this proposition, and relies upon our act of Assembly of 1782, ch. 23, and the law of common recoveries, to sustain it.   It must be admitted that this is a new case.   The act of Assembly has been in force more than half a century; very many estates tail have, in the mode prescribed by it, been enlarged into estates in fee, and, until now, it is believed the idea was never entertained, that a man, by divesting himself of all title to an estate tail, and conveying it to a stranger, makes the estate of that stranger, or the fee simple conveyed to him, answerable for debts of the bargainor, with the payment of which, while it remained the debtor's own estate, it could not have been charged.   Other notions have certainly prevailed, and in respect to them, perhaps, it is almost allowable to believe, that *communis opinio* (it is sometimes written *communis error,*) *facit jus.*   According to *Lord Ellenborough,* (3 *M. & Selw.,* 396,) this *communis opinio* might furnish some evidence of the law with which we are now to deal.   When so many estates tail have been con-

veyed, since our act of Assembly of 1782, to *bona fide* purchasers, who, relying on the obvious meaning of the act of Assembly, to be collected from its words, have paid the full price of an unincumbered fee simple, it may well be said, that the *communis opinio* in regard to such a conveyance, and its legal operation, was not "an opinion merely theoretical and speculative, floating in the minds of persons, but has been made the ground-work and *substratum* of practice."

But when and how did the judgment relied upon become a lien upon this inheritance? Surely not while the defendant in it had the estate tail. The question, it will be remembered, is relative to the inheritance, and whether that was ever answerable for the amount of the judgment? If there was no such lien upon this land, while the defendant in the judgment was the tenant in tail, was the lien created by the agreement to sell the land, or by the conveyance, which expanded the estate tail into an estate in fee? Surely there could be no lien of the description spoken of, which had no existence until the debtor, who had given judgment, had parted with all title, or pretence of title, to the land. It is a *concessum*, that the deed barred the estate tail of which the defendant in the judgment was seized when the judgment was rendered, and until the execution of that deed. But surely that deed did not vest in the bargainor a fee simple in the land conveyed, and unless it can be made to appear, that at the time of the rendition of the judgment, or afterwards, the defendant therein had a fee simple, no title to this land could be acquired under the judgment which would not have expired when the defendant died. The act of 1782, does not, in express words, make the judgment a lien upon this fee, or, it would seem, benefit the judgment creditor in any way whatever, unless it be that it enables the tenant in tail, by a sale of the inheritance, to procure the means of discharging this debt. It is said, however, that a former mode of barring estates tail (by common recovery,) did let in such incumbrances. Be it so; but this estate tail was not barred by any such mode, and, therefore, it does not aid the plaintiff's case at all to show, that if in this case there had been a com-

mon recovery, then this incumbrance would have been let in. This was one of the *incidents* to that mode of assurance, but it is no incident to the deed of bargain and sale; nor is it incident to an estate tail, that every mode of defeating it shall have such effect. It has been said by this court, in 1*st G. & J.*, 128, that " the ancient mode of docking estates tail by common recovery, is abolished by the act of 1782;" and *Chancellor Kent*, in his *Commentaries*, says, " the law of common recoveries, in those States which have made laws like our act of 1782, has become obsolete." If so, and there is no more recent legislative enactment declaring this, which was an incident to a mode of assurance no longer in force, to be an incident to that conveyance which the legislature has substituted in its place, it would be difficult to prove that this must be an incident to a deed of bargain and sale, which destroys an estate tail, because it was incident to another mode of accomplishing the same object, until that mode of accomplishing it was abolished by act of Assembly. *Chancellor Kent*, speaking of common recoveries, says, they were given "by a bold and unexampled stretch of judicial legislation." Had it been given by those who alone can rightfully legislate, we should have heard of no such incident to common recoveries. But legislation *in fraud of the rights of the legislature*, is very apt to produce results not anticipated by *judicial* lawmakers. "Hence it was that a common recovery suffered by a tenant in tail, lets in all his preceding incumbrances, and renders valid all the acts of ownership which he has exercised over the estate tail." In 5*th Cruise*, 493, ch. 9, we are told how this became an incident to a common recovery: "The judgment in a common recovery being of equal force with that which is obtained in an adversary suit, operates as an estoppel or record against all those who are parties to it, and concludes them from averring any thing against it." " The recoveror derives an estate in fee simple out of the estate tail, and also all those acts which bound the tenant in tail, will also bind the recoveror, *who cannot aver that the person against whom he recovered, had an estate tail.*" Surely it cannot be pretended, that a man who takes a deed

which he is expressly authorised by our act of 1782, to take from a tenant in tail, is thereby estopped from denying that the tenant in tail had the estate, and only the estate which the law authorises him to convey.

But, for the words " shall be good and available to all intents and purposes, against all and every person and persons whom the grantor, bargainor, or vendor might or could debar by any mode of common recovery," &c., (which words are to be found in the act of 1782, ch. 23,) it is presumed that no one could easily persuade himself that the enlargement of an estate tail into an estate in fee, (as authorised by that act,) would give to the creditor of the bargainor any incumbrance, charge or lien to which he was not otherwise entitled. Any person seized of any estate tail in possession, remainder or reversion, is authorized by any mode of conveyance spoken of in the law to convey to his grantee an estate in fee. The power to convey, and thereby enlarge the estate, is given to the tenant in tail, to be exercised by him in that and no other character. In thus conveying, he parts with all his estate, and conveys a fee simple, although of that estate he never had been, and never may be seized. The words of the law do not express its meaning, if they can be made to give to any other than the grantee, an estate which he could not have claimed, but for the deed. But, then, the act of Assembly, in its concluding words, speaks of those who could then be debarred by a common recovery. These words, it may be thought, merely introduces a new, more convenient and less expensive *common recovery*, with all the incidents of the more ancient and inconvenient mode. Why use those words, when, if they do not let in the incumbrances as formerly, they are supposed to be superfluous? And then we are told that we must find a meaning for, and give effect to every word in a law, if it be possible. It may be, indeed, that these words may not have been indispensable, in order to give full effect to the intent of the legislature, but then it must be permitted to our lawgivers, sometimes, to use *ex abundanti cautela*, words not absolutely necessary; and does not there seem to be some good reason for

such caution in this law? All common recoveries have not the same legal operation. Sometimes a common recovery may answer its purpose, although suffered with a single voucher; but, in many cases, it must be suffered with at least a double voucher, or it only bars the estate of which the tenant in tail is actually seized at the time, not estates in remainder. *Watkins on Conveyancing*, *p*. 69. "There are many niceties," *Wooddeson* tells us, "on these subjects." It was the policy of the legislature to unfetter the landed property, and make it a subject of absolute alienation, and but for these words, lawyers might have contended that a deed of bargain and sale, or other conveyance of an estate tail, would only perform the office of a fine, or of a common recovery, with a single voucher. Although it was evidently not the intention of the legislature not to let in the incumbrances, it was wise in them to introduce these words, and thereby "prevent contentions and mischiefs to the disquiet of the law."

It is contended, in behalf of the defendant, that although this be the law, yet there was no error committed by the court below, for which the first exception can be reversed. The exception is taken to a decision by the court, that the testimony offered by the defendant was admissible, and because, notwithstanding the plaintiff's objection, the court suffered it to go to the jury. This testimony, thus suffered to go to the jury, consisted of the judgment against the tenant in tail, *( Wallis,)* a revival of that judgment by *sci. fa.*, the sale of this land under a *fi. fa.* issued thereon, and its purchase by a person from whom the defendant attempted to derive title. For what purpose the testimony was introduced, or the grounds upon which it was objected to, the exception does not tell us; and it is said, if for any reason it is admissible, the court below was right in suffering it to go to the jury. Now this will not be denied. The evidence, however, must relate to the issue, and in this case the defendant's testimony, if admissible, must have a tendency to prove title in the defendant, or, more properly speaking, title out of the plaintiff. According to the opinion already expressed, the testimony now under consideration had no such

tendency. But the defendant, it is said, might have had other testimony. Certainly; and testimony, too, which was as valuable to him as it has been suggested it might be. But, the objection made to the testimony which was offered, if sustained, would not have prevented the defendant from offering any other, and, in truth, we cannot know that he did not obtain the verdict because of testimony before the jury which is not in this record. The existence of other testimony (whether before the jury, or not yet submitted,) could not authorise the admission of this proof. We, therefore, think the court erred in suffering it to go to the jury.

In the course of the argument, much was said about the proceedings on the judgment, and many of these proceedings were objected to, and many authorities, too, were cited, to show what were defects in the proceedings by *sci. fa.*, and how and when these objections, if sustainable at all, ought to have been made. The opinion of the court, already expressed, renders an examination of these several questions, and the authorities relied on, unnecessary to the plaintiffs. It was not understood that the defendant supposed that his case was made at all better by the issuing of the *sci. fa.*, and the proceedings thereon, than it would have been if no *sci. fa.* had been necessary, if the original judgment had been kept alive, and the *fi. fa.*, under which the land was sold, had been issued upon that, and not after a *fiat*. According to the opinion already expressed, the land in controversy was never answerable for this debt, and a sale of it was not authorised by any process issued after the death of the tenant in tail.

There remains one other exception, (the second,) which will briefly be noticed. The plaintiff offered to prove what *William Wallis*, the tenant in tail, had been heard to say, his declarations in his life time, and, among other things, that "he had got the land now in controversy by intailment." The court was asked, by the defendant's counsel, to say, and did say, that these declarations were admissible *for the purpose of proving pedigrees*. So far the exception presents nothing to be noticed by us. But, an exception is taken by the plaintiff to a further

instruction given by the court at the instance of the defendants, that these declarations by *Wallis*, were not admissible *to prove his title to the land as tenant in tail.* We can perceive no error in this instruction. Estates tail are created by deed or will, which must be produced, or a proper foundation must be laid for presuming that they existed. The existence of them is not to be proved by oral testimony of this description. We have not forgotten the reference which was made to *1st Greenleaf on Evidence, sec.* 109, "that declarations in disparagement of the title of the declarant, are admissible." But, without stopping to enquire when, about what, under what circumstances, or in what sections of our country such declarations can be received, we say, that these declarations by *Wallis* were inadmissible to prove, in this suit, anything about his title. If there had been admissible testimony (title papers,) to prove that he was, at the time of those declarations, seized in fee of the land, no declarations made by him, whether before or after the deed to *Blackiston*, or while under age, or when of age, could take from him his fee simple, and give him a fee tail estate for life, or for years. If, on the other hand, he had not the evidence which the law requires of his title, how could any declarations which he might make, be *in disparagement* of his title?

Reversed on 1st and 3rd exceptions. 2nd exception affirmed, and procedendo awarded.

JUDGMENT REVERSED, AND<br>PROCEDENDO AWARDED.